IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARITZA APONTE,  Plaintiff, | : : : | CIVIL ACTION |
| v. | : : | |
| KILOLO KIJAKAZI,[1]  Defendant. | : : : | No. 20-5008 |

**MEMORANDUM OPINION**

**Timothy R. Rice**                                                                                        **October 25, 2021**
**U.S. Magistrate Judge**

      Plaintiff Maritza Aponte alleges the Administrative Law Judge ("ALJ") erred in denying her Disability Insurance Benefits ("DIB") benefits by failing to: (1) incorporate all the limitations from her severe impairments into the residual functional capacity ("RFC") assessment;[2] (2) incorporate all the limitations from her non-severe impairments into the RFC; and (3) properly weigh the treating physicians' medical opinions. Pl. Br. (doc. 13) at 1-2. For the reasons explained below, I deny Aponte's claims.[3]

      Aponte alleges she is unable to work due to a combination of breathing issues, arthritis, depression, and anxiety. R. at 36-37. 157. Sixty years old at the time of the ALJ hearing,

---

[1]     Pursuant to Fed. R. Civ. P. 25(d) and 42 U.S.C. § 405(g), Kijakazi was automatically substituted into cases brought against the Commissioner upon his appointment.

[2]     A claimant's RFC reflects "the most [she] can still do [in a work setting] despite [her] limitations." 20 C.F.R. §§ 404.1545(a).

[3]     Aponte consented to my jurisdiction on January 5, 2021 (doc. 7), by failing to respond to prior notices (docs. 2, 4), pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 72, Local Rule 72.1, and Standing Order, In re Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018). See also Roell v. Withrow, 538 U.S. 580, 584 (2003) (consent to Magistrate Judge jurisdiction can be inferred from failure to object after notice and opportunity).

Aponte has an associate degree and decades of clerical experience. Id. at 33, 35, 39. On October 10, 2017, she was laid off from her job as a facilities coordinator. Id. at 348. In June 2019, she restarted full-time work through a temporary employment agency. Id. at 35. She testified that she returned to work out of financial necessity, not because of any medical improvement. Id. at 41. Her lawyer argued her return should be understood as the kind of trial return to work that would not preclude a finding of disability. Id. at 35.

The ALJ determined Aponte's RFC allowed her to perform only light work that requires lifting no more than 20 pounds, standing and walking for up to six hours in an eight-hour workday, sitting for at least six hours in an eight-hour workday, and no climbing of ladders or scaffolding or excessive exposure to pollutants, temperature extremes, or humidity. Id. at 19. Based on testimony from a Vocational Expert ("VE"), the ALJ determined that Aponte could also perform her past relevant work as an administrative clerk. Id. at 24.

The ALJ found Aponte had five severe impairments: (1) chronic obstructive pulmonary disease ("COPD");[4] (2) asthma; (3) rheumatoid arthritis;[5] (4) obesity; and (5) sleep apnea.[6] Id.

---

[4]  The Centers for Disease Control and Prevention (CDC) define COPD as "[c]hronic obstructive pulmonary disease, or COPD, refers to a group of diseases that cause airflow blockage and breathing-related problems." https://www.cdc.gov/copd/index.html (last checked 10/20/2021).

[5]  The CDC define rheumatoid arthritis as an autoimmune inflammatory disease that causes painful swelling in multiple joints, usually the hands, wrists, and knees. https://www.cdc.gov/arthritis/basics/rheumatoid-arthritis.html (last checked 10/20/2021).

[6]  Sleep apnea is a condition in which breathing stops for brief periods of time during sleep. Dorland's Illustrated Medical Dictionary (32nd ed. 2012) ("Dorland's") at 116-17, 427.

at 17. He found her hypertension, cardiomegaly,[7] and tachycardia[8] were non-severe because of their "very sporadic and mild symptoms." Id. He found her mental impairments were non-severe following an analysis of all functional spheres that showed only a mild limitation in one sphere. Id. at 18. Aponte was mildly limited in her ability to concentrate, persist, or maintain pace based on her declining to recite serial sevens in her consultative examination. Id.

I must accept all ALJ findings of fact that are supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000); see also 42 U.S.C. § 405(g); Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) (substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence"). I "review the record as a whole to determine whether substantial evidence supports a factual finding," Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014), but may not "re-weigh the evidence or impose [my] own factual determinations," Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011). Remand is appropriate only if ALJ error affected the outcome of the case. See Rutherford, 399 F.3d at 553.

    1.    <u>Failure to Include All Limitations Caused by Her Severe Impairments</u>

Aponte contends that the ALJ selectively parsed the record to minimize the severity of her conditions and failed to include in the RFC all functional limitations caused by her severe

---

[7] According to the Mayo Clinic, cardiomegaly is a symptom, not a condition, consisting of an enlarged heart. https://www.mayoclinic.org/diseases-conditions/enlarged-heart/symptoms-causes/syc-20355436 (last checked 10/21/2021).

[8] The Mayo Clinic explains that tachycardia also describes a cardiac symptom, sometimes normal and sometimes abnormal, of over 100 beats per minute. https://www.mayoclinic.org/diseases-conditions/tachycardia/symptoms-causes/syc-20355127 (last checked 10/21/2021).

impairments.  Pl. Br. at 1, 14-15.  Aponte claims that the ALJ effectively ignored her pain, her history of hospitalizations, and the episodic but debilitating nature of her combination of conditions.  Id. at 12-14.  Aponte argues the ALJ should have included the following limitations in his RFC: (1) the need for at least two unscheduled daily breaks of 30-60 minutes; (2) an inability to stay on task for more than 80% of the day; and (3) more than one day per month of medical absences.  Id. at 16.  The VE testified that those limitations would preclude full-time work.  R. at 44-45.

In support of his RFC, the ALJ reviewed Aponte's 2017-2019 medical history, noting the instances of hospitalization and complaints but also the many normal examination results and effective treatments.  Id. at 21-22.  Aponte cites records of a severe 2016 asthma exacerbation that led to cardiac involvement, pulmonary embolism, and extended hospitalizations.  Pl. Br. at 14 (citing, inter alia, R. at 224, 233, 240, 308, 370, 378-79, 384, 388).[9]  Despite missing three months of work for that episode, Aponte continued working full-time after discharge.  There is no evidence her health was a factor when she was laid off and collected unemployment benefits 14 months later.  Id. at 143, 148.

Other records Aponte cites from the time she was laid off show that she suffered from asthma and arthritis but managed her symptoms.  For example, at a July 2017 visit to her breathing specialists, Aponte reported that she completed a three-mile hike two weeks before having an exposure to polyurethane at work.  Id. at 262.  In October 2017, she reported she "had been doing well" before seeking treatment for "a viral URI induced asthma flare."  Id. at 283.  In January 2017, she reported feeling "ok," and starting a new treatment for her immune condition.

---

[9]      Aponte also cites 2012 and 2013 scans that did not prevent her from working full-time between the time they were taken and her onset date.  Pl. Br. at 14 (citing R. at 1603-04, 1648).

4

Id. at 694.  In February and March 2017, scans confirmed prior "mild" cardiac findings.  Id. at 825, 913.  In February 2017, she reported feeling short of breath when her husband had given her a cold, id. at 682, but by April 2017 she reported feeling "very good," id. at 629, and by June 2017 her asthma was described as "controlled," id. at 409.  She received shots in her shoulder and knees in June 2017 because her arthritic pain had increased when she stopped taking medication for it, id. at 356, and she was put back on arthritis medication that December, id. at 348.

In November 2017, after being laid off, she expressed concern about the effect losing her insurance would have on her ability to continue the treatments for her immune condition that she had begun in January.  Id. at 530.  She complained of an ongoing cough but was observed to be in "no apparent distress."  Id. at 537.  In December 2017, she was put back on arthritis medication, id. at 348, but had not started the medication as of February 2018 due to insurance issues, id. at 342-43.

Aponte visited the emergency room in March and July of 2018.  Id. at 506, 921. A CT[10] scan at the March visit showed "marked[]" improvement over a prior scan, with no evidence of ongoing pulmonary embolism.  Id. at 501.  Two weeks later she was feeling "'better' but not back to her usual self," and resumed a monthly injectable asthma medication.  Id. at 506.  She was examined by gastroenterology specialists and underwent a swallowing study to determine if there was another cause of her coughing.  Id. at 405.  She was prescribed medication and additional testing.  Id.  In early May 2018, she reported "feeling overall well," although she had some stiffness and lower back muscle spasms if she stood for too long that could be treated

---

[10]   A "computed tomography," "computerized axial tomography," "CT," or "CAT" scan, is a way of creating images of the inside of the body by measuring x-ray beams aimed through the body, digitally recorded, and processed.  Dorland's, at 440, 1935.

"well" with asper cream with lidocaine. Id. at 400. She declined psychiatric medication, id. at 401, was noted to be noncompliant with her CPAP treatments,[11] id. at 490, and reported she would be restarting medication to treat her arthritis because it had begun to bother her again, id. at 493. She continued to take the injectable asthma medication. Id. at 1486.

Aponte was hospitalized in early July 2018, when her asthma was exacerbated by the heat and humidity and worsened after prednisone left her immunocompromised. Id. In September 2018, Aponte switched rheumatology providers and reported the medications she had been taking since May were not working to address her stiffness, id. at 1073, although she denied pain, swelling, or difficulty walking at that time, id. at 1074. Her new provider saw no evidence of active rheumatoid arthritis, agreed with her previous provider that she was probably in remission, and ordered additional blood tests. Id.

In October 2018, she reported she had stopped taking her arthritis medications, and that she was having additional pain in her right ankle, knees, hips, lower back, and thumbs. Id. at 1056, (same record is also included at 1592). Her provider concluded she showed no signs of rheumatoid arthritis and diagnosed her with osteoarthritis. Id. at 1058. She was counseled about taking ibuprofen for pain, given a home exercise program, and told to consider losing weight. Id. She was prescribed an antibiotic when she visited her primary care provider after being sick for two weeks and was observed to be "mildly ill" and in "mild discomfort." Id. at 1740.

In November 2018, Aponte visited the emergency room again because of chest pain and a cough she claimed had lasted for three months. Id. at 2011. After testing showed she did not have a pulmonary embolism like the one she had suffered in 2016, id. at 2015, she left the

---

[11] A CPAP machine provides "continuous positive airway pressure," to alleviate the periodic cessation of breathing that characterizes sleep apnea. Dorland's, at 116-17, 427.

hospital against medical advice, id. at 2025. In April 2019, she complained of a persistent cough that was worse when she worked in an office. Id. at 1298. Her exam, however, was normal. Id. at 1315. Her medications were increased, she was counseled regarding weight loss, and referred to another provider for an evaluation of her cough. Id. at 1318. She returned to her primary care provider with a persistent cough in June 2019 and explained she had been taking her medication incorrectly. Id. at 1273. She was prescribed new medications but not antibiotics because her provider concluded her asthma had been exacerbated by the weather. Id. at 1276.

Two months later, in August 2019, she complained to her primary care provider of muscle spasms in her lower back, swollen, painful, feet, and asthma that was worsened by working in an office. Id. at 1889. Her provider, however, observed that she appeared to be in no apparent distress and suggested her swelling could be a medication side effect. Id. She prescribed a muscle relaxant and a medication to reduce fluid retention, counseled Aponte to reduce her salt intake, and ordered additional blood tests. Id. at 1890.

None of the records that Aponte cites undermine the ALJ's conclusion that she was able to perform full-time light work. They also do not show that she suffered from a 12-month period of disability that resolved. See Pl. Br. at 8 (suggesting the ALJ should have considered whether there was a "closed period" of disability). Although Aponte accurately asserts that her impairments periodically show more and less symptoms and that she subjectively attributed her exacerbations to an office environment in 2019, none of the records she identified show a 12-month period when she was not working when her symptoms were worse than the periods during which she was working. The ALJ accurately summarized the medical evidence.

He was not required to cite every medical record. Sutherland v. Comm'r Soc. Sec., 785 F. App'x 921, 928 (3d Cir. 2019) ("we do not expect the ALJ to make reference to every relevant

treatment note") (citing Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001)).  The ALJ accurately reported the course of Aponte's asthma, including her hospitalizations and exacerbations as well as her often normal examinations.  R. at 21-22.  His observation that the medical records "do not consistently confirm the severity" of her reported rheumatoid arthritis is supported by the evidence, which he accurately summarized.  He reported the complaints and findings made at her consultative examination as well as her normal gait and functionality.  Id. at 22 (citing id. at 1659 ("mild, symmetrical DJD involving both hands"), 984-85 (describing physical examination, including 4/5 upper extremity strength, 5/5 lower extremity strength, and 5/5 grip strength, as well as Aponte's ability to independently walk, undress, climb onto exam table and in and out of chair), 993-96 (describing normal ranges of motion in all joints except hips and knees)).  He also noted her providers' conclusion that her rheumatoid arthritis had gone into remission.  Id. at 22 (citing id. at 1575).

To the extent Aponte argues her asthma requires work-preclusive breaks, absenteeism, and time off-task, the ALJ noted Aponte was "employed full time" while reporting the same symptoms.  Id. at 22.  The ALJ cited evidence that Aponte was employed full-time even when her condition was at its worst.  Id. at 21-22.  The records he cited showed: (1) Aponte's FEV 1 values[12] improved from 1.32 to 1.55 between July and August 2017, id. at 257-64; (2) a more serious lung condition was ruled out and her injectable asthma mediation seemed to be working as of October 2017, id. at 282; (3) blood tests identified Aponte's autoimmune condition in May 2017, id. at 900-01; (4) one four-hour emergency room visit in March 2018 did not result in hospitalization but included scans that showed "markedly improved" lungs with "no active

---

[12]  A measure of lung function, FEV 1 shows how much air can be expelled by an individual in one second. https://www.ncbi.nlm.nih.gov/books/NBK540970/ (last checked 10/21/2021).

disease," id. at 913-15; (5) an emergency room visit in March 2017 lasted only three hours and did not result in hospitalization, id. at 908-12; (6) Aponte was hospitalized for two days in July 2018 when the immunocompromising effects of her RA treatments undermined her asthma treatments, id. at 925, although scans during the hospitalization showed "resolution" of prior lung problems, id. at 921, and there were multiple normal musculoskeletal, neurologic, and psychiatric exams, id. at 917-49; (7) a chronological summary demonstrated flares in her conditions could be managed by medications from July 2017 through April 2019, and the major concern when she was laid off in late 2017 was whether she would be able to continue those medications that had shown "significant benefit," id. at 1013; (8) November 2018 chest pains were musculoskeletal, not cardiac, and her complaints that symptoms were exacerbated in office environment were not supported by objective evidence, id. at 1015; (9) Aponte's FEV 1 values ranged from 1.39-1.62 when she was employed full-time between April 2014 and July 2017, id. at 1019-20, and from 1.34 – 1.54 when she was out of work between November 2017 and April 2019, id. at 1020-22; (10) a September 2018 cardiac scan was normal, id. at 1069; (11) her rheumatology specialist began to suspect her RA was in remission in September 2018, id. at 1073-74; and (12) a June 2018 asthma flare resolved within eight days, id. at 1427, once she took the medication as prescribed, id. at 1273.

     The ALJ provided substantial evidence to support the limitations he imposed to accommodate Aponte's severe impairments. I may not re-weigh the evidence to reach a different result. Donatelli v. Barnhart, 127 F. App'x 626, 630 (3d Cir. 2005) ("under the substantial evidence standard, the question is not whether we would have arrived at the same decision; it is whether there is substantial evidence supporting the Commissioner's decision"); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) ("whatever the meaning of

'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high").

    2.    <u>Failure to Incorporate Limitations Caused by Non-Severe Impairments</u>

Aponte also argues the ALJ should have found she required unscheduled breaks, was unable to stay on task, and would require excessive absences based on her non-severe impairments, specifically her tachycardia, anxiety, depression, and back pain. Pl. Br. at 18.

The ALJ explained that he found Aponte's tachycardia non-severe because the evidence showed it resulted in only "mild and sporadic symptoms," and there was no evidence showing it caused limitations that would impair "basic work-related functioning." <u>Id.</u> at 17-18. Her back pain was addressed by the ALJ as a symptom of her rheumatoid arthritis. <u>Id.</u> at 22-23. To reach the conclusion that her depression and anxiety were non-severe, the ALJ performed a full analysis of Aponte's mental impairments on the four functional areas, determining that, because the only limitation they caused was "mild" and limited to one functional area, the impairment was non-severe. <u>Id.</u> at 18.

The records Aponte cites show she suffered from tachycardia, but not that it caused any functional impairments. Pl. Br. at 18 (citing R. at 201, 390, 978, 1691-93, 1821, 1899, 2130-35). Records from a cardiology appointment in July 2016 shows that her tachycardia was exacerbated along with her asthma at that time, but also that she reported feeling "well with minor complaints." R. at 201. The 2019 medical opinion from Aponte's primary care provider found her severely limited, but capable of "low stress jobs." <u>Id.</u> at 2131. It also recommended that Aponte rest with legs elevated "above heart level," <u>id.</u> at 2132, but further noted that Aponte had been suffering from her limitations for "several years," <u>id.</u> at 2135. Aponte cites no records suggesting she has ever followed that recommendation. Pl. Br. at 18.

Aponte's primary care provider recommended extensive limitations based on her reports

of pain, id. at 2132-34, but described the evidence supporting them as mild lower extremity swelling, reduced range of motion, and Aponte's pain medications, id. at 2130.  The 2018 records Aponte cited to show her lower back pain should have required further limitations establish only that she suffered from lower back muscle spasms, id. at 390, 1821, 1899.  They fail to undermine the ALJ's conclusion that her primary care provider's recommendations were "inconsistent" with: (1) the "mild" physical examination findings; (2) the "mild" radiographic findings; and (3) the improvement which ultimately resulted in a finding that Aponte's rheumatoid arthritis was in remission, id. at 24.  The 2018 records show that this was a recurrence of back pain that had been successfully treated with medication and asper cream and was treated again with medication and exercises.  Id. at 390, 1821.  The 2019 records show that Aponte's primary care provider sent her for testing to ensure that a recurrence of her lower back pain was not kidney-related.  Id. at 1899; see id. at 1662 (May 2019 kidney ultra-sound with "mild" findings).  At that same visit, however, Aponte's primary complaint related to discomfort from coughing and she was observed, despite her complaints, to be in "no apparent distress," with normal musculoskeletal and neurologic examinations.  Id. at 1900.

The records Aponte cites to show the ALJ should have included further limitations based on her mental impairments show that she reported feeling anxious and depressed and that she was seeing a counselor in November 2018 and May 2019.  Id. at 1691-93, 1899.  It also shows that she first complained of feeling depressed because of losing her job in May 2018, id. at 400, and that she planned to see a psychiatrist, id. at 1691.  There are no records showing that she consistently received any psychiatric care or any psychiatric medications.

Finally, despite arguing that the ALJ erred by failing to obtain a consultative mental health examination, Pl. Br. at 18, Aponte also argues that the ALJ erred by failing to incorporate

11

the consulting psychological examiner's finding of moderate social restrictions into his RFC, id. at 19.  There was a consulting psychological examination in August 2018, and it included a finding that Aponte was moderately limited in her ability to "[r]espond appropriately to usual work situations and changes in a routine work setting." Id. at 978.  The ALJ found Aponte had no limitations in the social functional area because: (1) she attends church; (2) she shops; and (3) the only limitations she had described had to do with her physical limitations, e.g., other people's fragrances.  Id. at 18.  The consulting examiner did not list the bases of his recommendation on the check-box form Aponte cites, id. at 978, but described her anxiety and depression as "secondary to" her physical condition, id. at 973-75.  The RFC sufficiently addressed the aspects of Aponte's physical condition that limited her social interactions by restricting her from work conditions that would exacerbate her asthma.  Id. at 19 (limiting Aponte's exposure to pollutants, temperature extremes, and humidity).  The ALJ addressed the opinion and the examiner's testing results, id. at 18, so there is no question whether his opinion was "not credited or simply ignored," Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).

The ALJ cleared the "not high" bar of substantial evidence to support his conclusion that Aponte can perform a limited scope of light work.  Biestek, 139 S. Ct. at 1154.

3.     Medical Opinion Evidence

Aponte also claims the ALJ overestimated her RFC because he improperly weighed the medical opinion evidence and did not provide substantial evidence in support of his decision to give her treating physicians' opinions little weight.  Pl. Br. at 21-23.

Because Aponte filed her claim after March 27, 2017, she identified the wrong legal standard for consideration of treating physician opinions.  82 Fed. Reg. 5844-01 (Jan. 18, 2017) (treating medical source opinions regarding claims filed on or after March 27, 2017 are not

subject to the "treating physician rule" in 20 C.F.R. § 404.1520, but evaluated under 20 C.F.R. § 404.1520c). Under the new standards, ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Although the regulation lists the same host of considerations to weigh a medical opinion, the most important considerations, and the only considerations ALJs must articulate, are the "consistency" and "supportability" of the opinions based on the record evidence. Id. § 404.1520c(b)(2); see Quinn v. Saul, No. 20-813, 2021 WL 1695186, at *6 (M.D. Pa. Apr. 29, 2021) (describing new legal standard).

Aponte's treating pulmonologist opined she was capable of less than sedentary work. R. at 2137-41. Specifically, he recommended work preclusive limitations that included three absences per month, two lengthy unscheduled breaks per day, and opined she would be off-task for more than 15% of an eight-hour workday. Id. at 2138, 2140-41.

The ALJ explained he found this opinion "not persuasive" because: (1) it was not supported by her pulmonary testing results; (2) it was not supported by her record of hospitalization; (3) it was inconsistent with her frequently normal pulmonary examination findings; (4) it was inconsistent with the self-reported activities in her consulting examination; (5) the standing limitations were internally inconsistent; and (6) the only supporting symptoms noted for his conclusions were wheezing and cough. Id. at 23.

Even if I discount the ALJ's sixth reason and assume that Aponte's pulmonary testing and examination results are at least equivocal, the ALJ cited substantial evidence to support rejecting the treating physician's opinion. The treating physician's recommended standing limitations are internally inconsistent; he wrote both that Aponte could stand for more than two

hours at one time, id. at 2137, and that she could stand or walk for less than two hours total in an eight-hour workday, id. at 2138.  Although Aponte has suggested that her extensive record of hospitalizations proves her conditions are work preclusive, the evidence shows that her longest and most serious period of hospitalization occurred while she maintained full-time employment in 2016.  See id. at 224-240.  She had only brief hospitalizations in the years that followed, id. at 506 (March 2018), 1161 (July 2018), and was able to sustain full-time work despite periodic flare-ups when she returned to work in 2019, id. at 35.  This reasoning constitutes "substantial evidence" to support discounting the opinion, Biestek, 139 S. Ct. at 1154, and appropriately addresses the "consistency" and "supportability," as required by § 404.1520c.

Aponte's primary care provider recommended similar limitations, and in addition opined that Aponte's pain would affect her concentration, and she would need to periodically elevate her legs.  Id. at 2131, 2134-35.  The ALJ explained that this opinion was "not persuasive" because: (1) it was inconsistent with mild findings on multiple physical examinations; (2) it was inconsistent with mild radiographic findings; and (3) it failed to account for the improvement in symptoms that led treating providers to conclude that Aponte's rheumatoid arthritis went into remission.  Id. at 24.

The ALJ accurately summarized the record.  See, e.g., id. at 400 (noting lumbar muscle spasms have been successfully treated with asper cream), 1691 (describing Aponte's pain as "mild discomfort" and her rheumatoid arthritis as in "remission").  This reasoning also constitutes "substantial evidence" to support discounting the opinion, Biestek, 139 S. Ct. at 1154, and appropriately addresses the "consistency" and "supportability," inquiries listed in § 404.1520c.

An appropriate Order accompanies this opinion.